This calls number 24-20269. Strife v. Aldine Independent School District. Mr. Newar, did I pronounce it correctly? You did, Your Honor. You may proceed. May it please the Court, Scott Newar for the plaintiff appellant, Alicia Strife. Ms. Strife is one of thousands of military veterans who suffer from physical and psychological disabilities sustained defending this nation in war. Like numerous other severely injured military veterans, Ms. Strife depends upon a service animal to ameliorate her disabling PTSD, anxiety, and major depression and assist her with her significant mobility impairments. For approximately six months, August 30th of 2022 through February 24th of 2023, AISD constructively denied Ms. Strife this not only admittedly reasonable accommodation, but this critical workplace accommodation. AISD's constructive denial seriously endangered her physical and psychological health and safety. Ms. Strife, a nonprofit agency called Rescue for PTSD that trained and provided her with a service dog, and the undersigned counsel spent months trying to persuade AISD to relent. AISD refused. Therefore, after exhausting the ADA interactive process, Ms. Strife was forced to file not one, but two lawsuits to try to compel it to relent. And still they did not. Only on February 24th of 2023, almost six months later, under the threat of a federal court's preliminary injunction, did AISD finally relent. Now, on June 13th of 2024, the district court entered an order granting AISD's motion to dismiss Ms. Strife's reasonable accommodation and hostile work environment claims and summary judgment on her disparate treatment, her interference, and her retaliation claims. Ms. Strife respectfully submits to this court that the district court's order was erroneous. In her second amended complaint, which is 35 pages with 14 exhibits and numerous sub-exhibits, Ms. Strife sufficiently pled facts supporting an inference, but much more than that, that AISD denied her a reasonable accommodation and subjected her to a disability-based and retaliation-based hostile work environment. And in response to the motion for summary judgment, Ms. Strife adduced significant evidence, more than a genuine issue of material fact, that AISD denied her this reasonable accommodation because of an illegal animus against service animals and to interfere with her rights under the ADA and to retaliate against her for her protected activity. Now, it is critical to underscore what is conceded and is not in dispute before this panel. Four things. First, Ms. Strife is a qualified individual with a disability and disabilities. Her disabilities and limitations were known by AISD during the interactive process. The service dog, they admit, constitutes a reasonable accommodation of her physical and psychological disabilities, no dispute. And they admit that they would have suffered no undue hardship by allowing her to have her service dog at work. There are only three, I submit, your honors, three contested issues before this court. One, whether Ms. Strife sufficiently pled facts supporting an inference that AISD failed to make a reasonable accommodation of her disabilities and subjected her to a hostile work environment. Two, whether Ms. Strife raised a genuine issue of material fact that AISD subjected her to an adverse employment action, as the Supreme Court has now defined that term in Muldrow in 2024. And third, whether Ms. Strife… Counsel, would you explain in a little more detail, with regard to the hostile work environment claim and retaliation, what was the difference in her job atmosphere or environment before she made the request as opposed to after? So the complaint states, again on 12b-6, what it states is on August the 30th of 2022, she, this process of requesting the accommodation began. What happens on August the 30th of 2022 is that she goes essentially into a new position. She had been in the, sort of in the teaching position, the coordinator position. She goes into the human resources department as a project analyst. She has an office, an enclosed office, where she's not having contact with anyone other than essentially the co-workers and human resources. What the district court said in its opinion and where it erred respectfully is it said the conditions didn't change between before August the 30th of 2022 and after. And if you look at the complaint, there's not even any discussion of what happens in the 11 or so years before. She had been employed there for 11 years before, but the disabilities became much more serious, and we allege that in the complaint. She had several surgeries and falls between late 2020 and the spring of 2022 that necessitated surgeries. And so this was making her more and more limited in her physical mobility, and the PTSD treatments that she had been trying to use to help her were not working. I guess what I'm asking, maybe I can put a finer point on this. Those two claims in particular, a hostile work environment or retaliatory action, seem to traditionally involve some affirmative action by the employer or people who work at the company or in this case the AISD, some type of affirmative action that they take that causes injury to the plaintiff, you know, through annoyance or aggravation or some other type of inflammatory conduct. As opposed to the failure to accommodate, which I think you've addressed pretty completely already, I'm trying to draw a distinction between those claims, and I'm singling those two out because they do seem to me to involve an act committed, not just a failure to accommodate, which is, so to speak, to not do anything in response to a plaintiff's condition, but to actually go and do things affirmatively to injure the plaintiff. So that's what I'm asking about. So I appreciate your question, Judge Inglehart. I would say to you that, first of all, what is an adverse action has changed in light of Muldrow. It no longer needs to be a tangible employment action, an economic one, a serious one, a material one. This court has left it now to the district courts in the wake of Muldrow to develop the jurisprudence on what is an adverse accommodation, an adverse action. Excuse me. What we say in our brief and in our complaint is that this process, putting this woman, this disabled military vet, through the ringer for six months when she desperately needed this dog, that that was an adverse action because it forced her to work under seriously dangerous conditions. And by the way, Your Honors, it's not in the complaint, but it is in the summary judgment record at ROA 1139. There's a video of Ms. Strife's entry into her office, how she would have to go up the stairs to her office in the 2022-2023 time period. And you will see in that video how dangerous it was for her to climb these stairs. This dog was significantly needed and helpful to her. But again, Judge Englehart, I think so the adverse action has changed. And as far as the harassment component, if you will, for hostile work environment, well, the courts have – this court hasn't really fleshed out every nuance of what harassment is. But we say that under the pleading standard here – again, hostile work environment is only the pleading standard. We say that the conduct they engaged in by putting her through this ringer for six months, by trying to require her to go through an illegal medical exam, that that in itself violates the statute. So 42 U.S.C. 12112, get the number sometimes transposed. Counsel, I'm listening, and I thought I heard Judge Englehart's question, at least the initial question, I thought had to do with hostile work environment. And I'm listening to hear something that you contend created a hostile work environment, and you're saying putting her through the ringer. Well, that's all of the asking for verification and an independent medical examination and all of those things, which might support some failure to accommodate or delay in accommodating. But I'm listening for something that creates a hostile work environment, which I – I guess my perception of that is what's happening at work that makes the environment hostile. Right. Is that what you're talking about? And what we submit, Your Honor, respectfully, is that this conduct – now harassment, no one was saying to her, you know, you're – there weren't epithets, there weren't actions that were engaged in by individuals to harass her affirmatively. But this conduct was a form of harassment. If you tell a disabled person who seriously needs this accommodation, we're not going to give it to you, which is effectively what the school district was doing. For six months, and you force her to work under those conditions, that is a form of harassment. And by the way, Your Honor, both Judge Englehart – And that harassment equals hostile work environment. That does, Your Honor, and I'll cite you, Your Honor, to the fact – to the Supreme Court in Muldrow cites to a Fifth Circuit case called Linear, which talks about allowing white employees to work inside with air conditioning, forcing African-American employees to work outside in the heat, that that can constitute a form of adverse action. So, again, there is – So now you're talking about adverse action. I'm talking – but I'm saying that there is a – there is an overlap there. And, again, we're not – That would sound to me like a hostile work environment. I've got to work in the heat and somebody else gets to work under air conditioning. We are literally talking environments. Go ahead. As I said earlier, I think that at the pleading stage, we're not at summary judgment. It may well be that a hostile work environment claim disappears on summary judgment. But at the pleading stage, which is where the district court dismissed the hostile work environment claim, we have alleged sufficient acts and conduct that survive a 12B6 motion to dismiss. Let me turn – if, Judge, I haven't answered your question. I want to, so please tell me if I need to. No, go ahead. Let me just clarify with you. You mentioned a change in position that she had and maybe a reassignment to a different office, physical office. Correct. Was that done after she made the request for the service animal or that was prior to? Prior to. In the 2022 school year, she goes into this human resources project management position, which was completely different than the position she had before. I just want to make sure because it seemed for a while there that you were implying that she made the request and then they said, well, we'll show her. We'll give her an office that's even further down. Not at all. And if I have led you to believe that, I apologize. I just want to make sure I fully understood. That's not the case. Let me address the interference prong, which is sort of a unique claim in this case because this is a claim on which this court has not written. In other circuits, only a couple of them have actually addressed it, and my colleague from the EEOC will address it perhaps in more detail. But on the retaliation, and this goes back to your question, Judge Engelhardt, on retaliation, this interference claim is an independent claim. Under 42 U.S.C. 12203B, there's an interference prong that is separate and distinct from retaliation. And although this court hasn't written on it, the D.C. Circuit did in a case called Dillon, laid out a couple of different formulations of what the prima facie case or the elements could be. We believe that the second formulation there, which is the EEOC's formulation, is the correct one. But regardless, Ms. Strife briefed that issue in the district court. She specifically pleads in a footnote, this interference claim is distinct and separate from the retaliation claim. It is predicated on the same facts as the retaliation claim, but it was briefed. And that was one ground on which the district court granted summary judgment essentially. But the district court went on to say, well, there's no evidence of interference. Coming back to what I said to Judge Graves earlier, the interference here is as palpable as it could ever be. They were erecting obstacle after obstacle after obstacle to prevent her from getting this service animal. We submit that the interference prong here is absolutely more in play in many respects than the retaliation prong or even hostile work environment or disparate treatment. And so I would ask your honors to take a look at Minikin v. Dillon, the D.C. Circuit case, and the cases that are in the EEOC's brief as well. If there's not any other further questions, I'll go ahead and unmute Reserve. You said they were preventing her from getting the service animal? So she didn't have it and just wasn't able to bring it to work. They prevented her from even getting a service animal is what you're saying? No. The service animal was awarded to her by this Rescue for PTSD, this nonprofit agency. Once she got the dog, she went to AISD and said, I have a service animal. I'd like to work with this dog. I understand. I just thought I heard you say they prevented her from getting it. And I always thought she had it, but she wasn't allowed to bring it to work with her. She did. All right. Go ahead. One other couple of points on this issue of delay versus denial. Now, this has come up in the court's jurisprudence on this. And there's this sort of question about whether this is undue delay alone is actionable. This is not an undue delay case alone. It's not undue delay alone that's going on here, right? It wasn't just that the district was trying to figure out what to do here. The district had, by November the 1st of 2022, it had three certifications. One from her doctor of pharmacology, who at the VA is a clinician, a treating clinician, who had been treating her for years, prescribing her medication. That's Dr. Miller. They had a certification from Dr. Mann, her psychiatrist, in late September. And then on November the 1st, Dr. Mann submits a fully filled out job accommodation questionnaire. So they had all of this information by November the 1st. And the critical point here, Your Honors, is this. They admitted in their deposition, Ms. Smith, the primary person for the school district, admitted in the deposition, yes, we got all of that information from Dr. Mann, the psychiatrist, but that wasn't good enough for us. We wanted... Counsel, I don't know if you realize your time has expired. I apologize, Judge. I'll give you a moment to wrap up. I apologize. Go ahead. The point I was going to make is that by November the 1st, they had everything they needed on the psychological side, but they were not going to give her the dog unless she could prove to them that she needed it for her physical disabilities. That's where the bad faith, the animus, is relevant and is shown in this case. All right. Thank you, Counsel. Mr. Winkleman. Good afternoon, Your Honors, and may it please the Court, I'm Stephen Winkleman with the EEOC. The EEOC is participating to address only Strife's failure-to-accommodate and interference claims, and I'd like to begin with the failure-to-accommodate claim, which the district court disposed of on a motion to dismiss. There is fundamental agreement among the parties and the district court that an undue delay in providing a reasonable accommodation can violate the ADA. The sole question in dispute is at what point a delay becomes unreasonable and therefore actionable. I thought that was part of the dispute, too, but I just heard your friend, the appellant, say that's not the question in this case and that, in fact, we don't have to resolve it. Well, with all due respect, Your Honor, at least as the terms undue delay and constructive denial are used in the case law, I don't see a lot of daylight between those concepts. I don't want to speak for my friend, but I think he was suggesting that perhaps there's more here because there may have been intentional animus. I heard him say that this is not a question of whether delay can constitute constructive denial because there's all this other stuff and they had it in November and they should have approved it. And at least as this was argued in the district court, and I believe even in the appellant brief, suggested that the undue delay in providing the accommodation could lead to a violation of the ADA, and that is consistent with the approach that other circuits have taken. How many days or months? I'm deeply sympathetic to the claim in this case. I mean, Ms. Strife sounds like a decorated veteran and I understand the need for service animals, so I don't mean this to be a hostile question at all, but I don't understand how many days, weeks, or months would be undue. Well, under a totality of circumstances approach, it's going to vary by case. What's reasonable under one set of circumstances may be unreasonable under another. And what was the day here? What was the what? On the totality of the circumstances in the position of the United States government, what was the day when this went from a due delay to an undue delay? I don't think the court needs to precisely resolve that question. It is clear from the allegations in the complaint that over time, Strife continued to provide additional information. I think a fact finder ultimately, if this went to trial or summary judgment, a reasonable fact finder could conclude that at some point in that process, the delay became unreasonable. But for the purposes of resolving the motion to dismiss, the court doesn't need to resolve at precisely which point it became unreasonable. Well, you obviously see a lot of these cases across the country and I assume that the reason that this matters is because if a delay can become undue and hence become a constructive denial, the plaintiff in this case would be entitled to money damages for each day after that undue delay, right? They would be entitled to damages if the delay constituted a violation. So if the EEOC gets its view sort of adopted throughout the country, obviously we haven't adopted it yet, but if we were to adopt it, I assume that the endgame here is that the finder of fact is going to be in a situation of calculating damages based on that day, right? There's at some point in the spectrum between August and February, from 22 to 23, the delay became undue and that triggered the monetary liability. Again, I don't mean that to be a trick question. I assume that's what this entire case is about, right? Your Honor, I don't know that that's even an issue that the court needs to ultimately address or what is ultimately at issue here. The sole question at this point is whether the undue delay in providing the accommodation can constitute a violation of the ADA and under what circumstances the delay becomes unreasonable. Counsel, I completely understand, but obviously you're not a party counsel here. You're an amicus and so your position is supposed to be broader and you filed a brief on behalf of the United States to urge us to wade into this discussion that's going on through the circuits and so I'm just trying to understand where this road is going. If you're going around courts across the country and saying please adopt this standard that a delay can in and of itself, without anything else, constitute constructive denial and a failure to accommodate, then I'm just trying to understand how this cashes out. At the end of the day, it sounds like it cashes out of a fact finder saying that's the magic day, that's when the monetary liability attaches and you have to pay for every day after it. Yes, and I apologize if I didn't understand the question. Ultimately what the fact finder would have to determine is at what point the delay became unreasonable and that may affect ultimately the amount of damages that they award. Excellent. But for purposes, again, for purposes of resolving the motion to dismiss, the court doesn't need to resolve precisely at which point the delay became unreasonable. It's enough that the circumstances as alleged in the complaint raise a reasonable inference or plausible inference that the delay was unreasonable. And very briefly on the interference claim, I'll just note that the statutory text again makes clear that protected activity is not an element of an interference claim and I see my time has expired. I'm going to give you an extra minute and I'll add a minute or two over here. Everybody's needing a little extra, so take it. Thank you, Your Honor. Just briefly, the school district's position is that the only circumstance in which a delay could lead to a violation of the ADA is one in which the accommodation is no longer reasonable to provide. I do want to make clear that that position would eviscerate the ADA's reasonable accommodation mandate. Under that approach, if a plaintiff, as in this case or in Feist, requested an accommodation, even when they are capable of performing the essential job functions without accommodation, no amount of delay would render that accommodation unreasonable and therefore would never violate the ADA. Unless the Court has any further questions, we'd ask that you reverse on the grant of dismissal. Thank you. Thank you, counsel. Mr. Rush. Good afternoon. We added a minute. You don't have to use it. I'm going to try my very best to give it back to you, if that should please the Court. You may proceed. I'm Corey Rush. I'm pleased to represent Aldine ISD in Houston. I think listening to my friend on the other side's argument here today, it dawned on me once again that even though there are five claims present in this lawsuit, there's one split five ways. It's a failure to accommodate claim that we tried to shoehorn in this lawsuit, apparently into five different claims, be it failure to accommodate, harassment, disparate treatment, retaliation, and interference. This is all premised on a six-month period, which if you listen to it in a vacuum, you might think, wow, six months sure does sound like a long time for no response. That's not what happened. What happened was bilateral communications where the employer, the school district, was trying to obtain additional information so that the Employee Accommodation Committee could process and make a decision regarding Ms. Strife's requested accommodation, which was to bring her service dog to work. These were bilateral communications. That is the interactive process. We're talking six months here. Was there any point in time where Ms. Strife did not respond to whatever your client was asking for, whether it's further information or submission to any type of examination or anything like that? In other words, do you have any argument that she was responsible for the delay, in part? So, Your Honor, I'm not arguing, and I wouldn't argue that she's responsible for a breakdown in the interactive process the way we've seen in, like, Lill Sexton, other cases going over decades at this point, because the interactive process didn't break down. It just was longer than, I think, anyone anticipated it being. Six months is kind of a long time. I would agree with that. It's a single request. It is a single request where the response was, we would like additional information, especially in regard to are alternative accommodations available? Because this is not a strict liability statute. This is not a statute that says the plaintiff asks for a Cadillac, they get the Cadillac. This is a statute where the plaintiff asks for a Cadillac, and the employer can say, what about the Chevy? Does that get the job done, too? What was the Chevy that was offered? If not the dog, what was the alternative? This is quite simple, Your Honor. For the mobility issues in particular, a walker, a cane, or a wheelchair, we were confronted with balance issues, and the question was, why not a walker, a cane, or a wheelchair? And that answer, to get to the question about whether there was, you know, traceable faults in the interactive process, that's the information that was not provided, despite entreaties. So, yes, Ms. Strife did provide information from her doctor of pharmacology and from a psychiatrist. They were verbatim identical pieces of paper that didn't answer the questions the Employee Accommodations Committee had. We did not get that until after the TRO hearing. So you are arguing that she is at fault for the delay, then? For the delay, yes, just not for a breakdown, yes, Your Honor. And you're saying there was no indication from her that the service dog was needed for any psychological reasons? She did say that it was necessary for the psychological conditions for PTSD and relating limitations, and one of the things that came up very early on was for deep pressure therapy. That's about anxiety. That's about response to anxiety. Well, we know that a cane, a wheelchair, or a walker isn't an alternative for psychological. Correct. That's for the mobility and the balance issues, Judge Graves, but we never really even got to discuss what alternatives might be available for somebody suffering with PTSD for their anxiety-related limitations because the fixation on the committee was, do we need to grant the dog for this mobility issue? Why do we need a dog? So the committee didn't know about the psychological issue? No, they absolutely did. That was presented in September of 2022. So you were looking for an alternative to the service dog to deal with her psychological issues? The service dog alternative for both, right? I mean, you can talk about alternatives for, and this isn't in the record, this wasn't something that was developed out in this particular case, but the issue for somebody suffering from anxiety triggered by PTSD or related issues, there are hundreds of available accommodations for that that school districts as employers grant all the time to its employees. Be that break times, weighted blankets, meditation apps, there's hundreds and hundreds and hundreds of available opportunities. The questions came up from the committee in particular because the initial response being, we need more information to show why you need this dog to perform a job or have equal access to the environment, to the employer environment, and can we discuss alternatives? What alternatives might there be? That's a blanket statement back up regarding to the mental limitations conditions too, right? If you are talking about, ask your doctors, what alternatives might there be to the service animal? She's talking to her psychiatrist. If the psychiatrist had ever at any point written back with the answer, there are no alternative accommodations, the dog is the only accommodation that will help her assist her with her PTSD and related symptoms, it wouldn't have taken six months. Those were the answers we did not get. We did not get any answers to those questions about alternatives until after the TRO hearing. There was never a decision made to deny her accommodation request. So when you're talking about the fixation on the six months, there's a really big important anniversary coming up this month in February. In three weeks, we will have the two-year anniversary of Ms. Stripe working with her dog every single day at Aldean ISD because the school district granted the exact accommodation she requested. So... Is this the first request you've ever gotten for a service dog in the school district? In Aldean ISD, it is the second that I know of. That is probably not exhaustive, Your Honor, but what I know... Did the other one take six months? The other one was not actually approved through the accommodation process. It was... This is a more complicated story, and unlike the other party to this, Aldean ISD actually did abide by the confidentiality order under the EEOC settlement agreement, but it was granted at the campus-based level without paperwork. It trickled its way up to HR eventually, and then there was an issue about whether or not that accommodation would remain. But there's not some employer-side prohibition or restriction. It's not like there's some... You don't have any objection to the dog. You just wanted to make sure that the dog was justified under the facts. Is that what I'm understanding? That is right, Your Honor. There was never a blanket... I was about to make a really bad pun and stop myself. There's never been a blanket objection to a dog. That has never been the point. My friend on the other side mentioned that the districts never stood up and said, like, this was an unreasonable accommodation. He's using my words from the TRO hearing, where it's in the transcript where I said, we're not here to dispute that this service animal might be a reasonable accommodation. It very well might be the answer. We just wanted the full information so that we could come to a decision. How long do you think a school district can delay granting an accommodation? Like, I hear you on the paper, but just imagine she'd sent in what you asked for. Part of this whole fight was that you wanted an independent doctor. She said, I'm not doing an independent doctor. I've already had my VA doctors. I've sent you three different medical opinions. That should be good enough. How long, if she had done what you'd asked her for, could you still wait and avoid liability for failure to accommodate? So I don't know that there's a bright line rule, one day, one week, three weeks, whatever. I think it matters what happens during that time as to what sets up a claim. Because just like any other employment discrimination case, y'all are not here to sit as super HR personnel. You're here to ferret out discrimination and retaliation and harassment. So if you're talking about a delay of three days where all the information was in, what if the employer in those three days said, rather than going, you know, we granted it, that's going to be really expensive, we have three days to build that file and make him or her resign? Well, then we're talking about harm. Then you can say, like, yes, that constructive denial here, you used the fact that they could not perform the essential function of their job or a function of their job against them. You built a file against them to force resignation. But in this case, you never got the information you wanted, right? Never. Not until after the TRO hearing. So you effectively settled before the TRO hearing? Right after the TRO hearing, yes. That's, I mean, it feels a little no good deed goes unpunished in a sense. But Judge Bennett, and I did put this in our brief, and it's a long transcription, and I apologize for that, but I thought it was very important that Judge Bennett was, he admonished both sides about what he expected the injunction hearing to look like when we had it. After some discovery after the TRO hearing, he looked straight at me, and he said, District, do not come in here and tell me that the process is still underway. I don't want to hear it. That will make me angry. And then he looked at the other side and said, and I don't want to hear from them that you guys have not given them the information they need. I'm not asking you, I'm not telling you what decision to make. I'm not putting my thumb on the scale. I'm just telling you, make a decision. So when after the TRO hearing, you know, yes, sir, marching orders, I did reach out to opposing counsel, and this is in the record, it's in the brief, to try to get the missing information. I drafted some narrower releases, let me know what you think. And I get back, of course, an alternative accommodation isn't going to work. It wouldn't work because if she fell and she's grounded, then the dog can help her up, and a walker or a cane and wheelchair couldn't. Somebody answered our question. For the first time in February of 2023, what alternatives exist? The answer, none. And so that was turned over to the Appellate Accommodations Committee, and that accommodation was granted. And in those six months that went from August to February, now two years ago, what happened to Ms. Strife? She worked. She did not fall at work. She was not reprimanded. She did not, there's no evidence of a, or there's no allegation, if we're looking at it from a 12B6 perspective, there's no allegation that she tripped at work, that she fell at work, that those stairs caused her any harm, that she was reprimanded, that she was, any sort of campaign to have her resign out. She worked, just like she had done for the district since 2012, and just as she had done for the five years previously after the VA decided that she was 100% disabled as of 2017. So this is not the situation that in DICTA this court has gone into about when a delay might constitute a failure to accommodate. It's just not. The little such footnote gives those kinds of examples, and I'll be the first to admit to you, they're not exhaustive. There's very creative people out there who I'm sure can come up with really terrible things to do to somebody, but we're not talking about that in this case. She just came to work. That's what was pleaded. It was pleaded that she was an all-star employee, that her evaluations were stellar, that she had always been able to do her job. That's what the judge was presented with, was in the complaint itself 10 years of exclusively good employment history that didn't change based on some action or inaction of Aldine ISD. And when it comes to conflating these causes of action, I can't stress it enough. They are separate. A failure to accommodate claim is not a disparate treatment claim, is not a retaliation claim, is not an interference claim, but all the facts here all mesh into one thing for these five claims, which makes it kind of confusing. But to break it down, when it comes to Judge Bennett's decision, he did dispose of the failure to accommodate and harassment claims on the 12B6 motion. I think he was right to do so. There was nothing in that complaint that demonstrated any undue delay that led to a failure to accommodate. There was nothing even hinting at what we would think the hallmarks of a harassment claim might be. At what stage of the discovery were you all in at the time of the motion for summary judgment? Had you concluded the discovery? Yes, Your Honor. Discovery was concluded, and the summary judgment was fully briefed by both parties on all issues. With the harassment claim, the complaint contains not a single hallmark of the we're forcing men to work inside, or having men work inside, I guess we should say, we're in the South, having men work inside and women outside. That's obviously disparate treatments, harassment. But then when it comes to the procedural history of this case, it's irregular with the fact that the motion to dismiss, the live complaint, had not been ruled on when the summary judgment deadline approached. So the district fully briefed all issues, including failure to accommodate and harassment, in its motion for summary judgment. That summary judgment was responded to, evidence was submitted, discovery was closed. The issues of failure to accommodate and harassment were fully briefed and primed for Judge Bennett's ruling in the court below. So he just disposed on it again, as he had previously, in the Rule 12b6 motion. So when you break down the summary judgment claims that he did grant, when it comes to disparate treatment, this court has articulated what the test for an adverse employment action is, and we're looking for something that is more than a de minimis harm. The Supreme Court has, in Muldrow, has said that it would be improper to hold a Title VII plaintiff to a significance test. I think those cases plainly talk to each other when we're talking about something less than significant, something more than de minimis. But all that being said, something has to happen. An adverse employment action demands action. That's part of the definition. What action was taken against Ms. Strife? The only one... I mean, there's two that are alleged, right? It's the six-month delay. Was the failure to accommodate claim dismissed on 12b6? Yes, Your Honor. Oh, it wasn't on summary judgment. It was argued on summary judgment, dismissed under Rule 12b6. On 12b6. Yes, Your Honor. All right. So something has to occur for it to be an action, an adverse employment action. That's just common sense. So to shoehorn the delay in the interactive process and the ultimate granting of her accommodation to an adverse employment action just doesn't really square with the round hole. It just doesn't fit. Then you've got the independent medical examination. That didn't come out of nowhere. That came out of we, as the district, were not getting the answers to our questions. We were getting the same information over and over again, which was essentially boiled down to, I want my dog. That's kind of what we had. I guess what I'm hearing, counsel, sounds like a lot of facts. All of those facts make me a little leery about a 12b6 dismissal of a claim. Well, the facts I'm discussing right now were the disparate treatment claim, and that was disposed of under the motion for summary judgment. The delay to accommodate is on the delay. Correct. But it is also alleged to be an adverse employment action.  I'm sorry? I mean, the delay has to do with facts, and that's what was going on during that six-month period. Correct. It does, but because the accommodation, the failure to accommodate the delay in the accommodation, is also argued as an adverse employment action in support of the plaintiff's disparate treatment claim, which was disposed of on summary judgment. This goes back to the problem that this is one claim split five ways. So the only other alleged adversity in this case, adverse employment action, is the independent medical examination, never came to fruition, never happened. It was directed, it was scheduled, she did not attend. The only reason it gets to that point, it is in the record, it is in the summary judgment record, is because the district had tried for the period of several months to get answers to its questions, and they weren't getting answered, especially when it comes down to are there alternative accommodations available. You can scout, the record is as tall as I am, you can scour it, and you are not going to find an answer to that question until after the TRO hearing in February of 2023. So all that to be said, there's no adversity. The district court got that right to dispose of it on the disparate treatment claim for lack of an adverse employment action, but also appropriately disposed of the retaliation claim on lack of pretext. And if the plaintiff can't meet the burden on but-for causation for retaliation and pretext, she certainly cannot meet it for the lesser standard under disparate treatment discrimination. That evidence is in the record, and this court can affirm summary judgment on any evidence in the record presented to the district court but not ruled upon. With my remaining time, and I really do want to try to give some time back, the interference claim is a little bit of a mystery. It remains a mystery to me even to this day. It was not pursued in the district court. It was a footnote. It was a footnote saying, see above for my retaliation claim. That is not... I heard that, and it was great. Because that is true. So I hear my colleague from the EEOC, and I agree that there's room to make a test for an interference claim. This isn't the vehicle for it when it wasn't argued below, and when the allegation is it was conflated with a retaliation claim, that was an invited error by the plaintiff herself to conflate her interference claim with a retaliation claim. So unless there are any other questions, I'm happy to cede my time back. Thank you, counsel. Thank you.  It pleads the court. The interference claim is not just in a footnote in the summary judgment. The explication of the fact that it's a distinct and separate claim from retaliation is in a footnote. However, there are multiple places in the summary judgment response where we assert distinctively and specifically that we're asserting interference claims. It's also throughout the second admitted complaint. So the argument that we didn't plead it, whether you plead it in a footnote or whether you plead it in the body of the text, it's in the case, and it was in the case in the substance of the motion, of the response. Counsel, do you agree that you never answered the question about other accommodations? The answer is... Well, let me answer the question this way, Your Honor. It was never posed to her, meaning they never proffered, they never said to her, what about a wheelchair, what about a cane, what about a walker? They talked internally, according to their notes, about those, but they never came to us. What did they say to you? They said nothing about alternative accommodations. And the argument that you just heard from counsel that they didn't get any answers to their questions until after the TR hearing is blatantly untrue. They had everything that they used for the quote-unquote committee decision on February the 21st. They had it all by January the 12th or 13th. Counsel, are you telling me that in the iterative process that went on from August of 2022 until February of 2023, that they never asked you a question? That is correct. Not a single question. I'm sorry? Not a single question of any kind. The counsel for the school district, the in-house counsel, Ms. DeWalt, in her exchanges back and forth with me, said you have not identified alternative accommodations. There weren't any alternative accommodations that her doctors had recommended. Under the interactive process and under the case law, we were not required to identify alternative accommodations. They were required to propose them, and then we would have responded in the interactive process as to whether they were reasonable by consulting her doctors. They did not do that. Counsel, I understand your argument about the significance of it, and I've obviously not been here as long as some other judges have, but I've sat through a lot of oral arguments and a lot of employment discrimination cases, and I have never heard a starker disagreement in the well of the court. Your friend got up here for about 18 minutes and said we asked questions, we asked questions, we asked questions, we never got a question. I've got the record in front of me. It's almost 3,000 pages long. Look through there for the answer to our questions. We never got it until the TRO hearing, and you're standing up and saying they never asked us a question. I think one of you is not being candid. I'm hesitant to say lying, but that's a very stark disagreement about something that is demonstrably true. Demonstrably provable. One way or the other, one of you is right about this. Are you telling me that the school district never came to you and asked you any sorts of questions in that entire six-month period? The school district came to us in the form of written communications and said this is why your doctor's certifications are unacceptable. One is signed by a doctor of pharmacology when the doctor of pharmacology doesn't use the pre-nominal of DR before her name. One is electronically signed by the psychiatrist. That's not good enough for us. They never came to us and said would any other accommodations be acceptable to you? For example, what they're now claiming was what the committee was interested in, these mobility accommodations. So yes, I am definitively saying you will search the record and you will not see where there is a communication from their counsel to me or from them to Ms. Strife or for them to the Rescue for PTSD saying what other accommodations would you consider or what we want to propose. And in fact, they admitted in their deposition testimony, Ms. Smith, the benefits coordinator, admitted we never proposed and we never offered any other accommodation. It is in the record. Any other alternatives? You said accommodations, but... They didn't offer the dog to begin with. We never got the dog until February the 24th in the letter. But that was your initial... Your initial offer was the dog. That is correct. All right. That is correct. And judge... And I just want to be clear because now you're using the word accommodations where I before was using the word alternatives, I think. They never offered any alternative to the dog. Nothing. All right. And never asked you about any alternative. Never asked us. And they never asked you whether there could be any other alternatives. Never asked me whether there could be any alternatives. We would have gone back to her doctors and said, OK, what about this? What about that? And by the way, I refer you to the November 1st, 2022 job accommodation, a questionnaire submitted by her doctor, Dr. Mann, the psychiatrist. He was specifically asked at question 4, what reasonable accommodations... accommodations, plural, do you recommend for the limitations and disabilities you have diagnosed? And he wrote, service dog, service animal. He gave his recommendation, as did her clinician, the doctor of pharmacology, as did the rehab doctors in January. There was never, never a recommendation for anything else. All right. I see my time is up. Thank you, counsel. Thank you.